

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Tom Peabody, (312) 353-4307
AUSA Melody Wells, (312) 353-1110

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

PETER STOKES
    also known as "Bouquet", "Spencer," and "Jordan"

CASE NUMBER: 25 CR 812

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about May 12, 2025 to on or about May 15, 2025, at Mount Prospect, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 18 U.S.C. § 1030(a)(2)(C) | computer intrusion |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

ALI SADIQ
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>December 22, 2025</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>

Daniel P. McLaughlin, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, ALI SADIQ, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed for 10 years. My current responsibilities include the investigation of cybercrimes and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, including hacking, computer intrusion, and related conspiracy offenses.

2. This affidavit is submitted in support of:

a. a criminal complaint alleging that Peter STOKES has committed computer intrusion, in violation of 18 U.S.C. § 1030(a)(2)(C) (the "**Subject Offense**");

b. a warrant to search a directory on the Western Digital hard drive with serial number B00LW5YD containing data files from a server, described further below and in Attachment A-1, for evidence, instrumentalities, and fruits of violations of 18 U.S.C. § 1030(a)(2)(C), § 1343, and § 371 (the "**Subject Offenses**"), as described further in Attachment B-1 ( "**Subject Server 1**");

c. a warrant to search the Apple iCloud accounts with DSID 18743558491 (the "**Subject Apple Account 1**") and DSID 21898004821 (the "**Subject Apple Account 2**"), described further in Attachment A-2 (the "**Subject Apple Accounts**"), for evidence of the **Subject Offenses**, as described further in Attachment B-2;

d. a warrant to search the Snapchat account with User ID be547f61-dabe-4b6c-867e-e06d07eee7af, described further in Attachment A-3 (the "**Subject Snapchat Account**"), for evidence of the **Subject Offenses**, as described further in Attachment B-3;

e. a warrant to search the Facebook account with UID 61550509450331, described further in Attachment A-4 (the "**Subject Facebook Account**") (collectively, the **"Subject Accounts"**), for evidence of the **Subject Offenses**, as described further in Attachment B-4; and

f. a warrant to search the Google account with email address mykccncn109@gmail.com, described further in Attachment A-5 (the "**Subject Google Account**"), for evidence of the **Subject Offenses**, as described further in Attachment B-5.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging STOKES with the **Subject Offense** and search warrant applications for evidence, instrumentalities and fruits of the **Subject Offenses**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause to believe that the defendant committed the offenses alleged in the complaint and that evidence, fruits, and/or instrumentalities will be found in **Subject Server 1** and the **Subject Accounts**.

4. This affidavit is based on my personal knowledge, my review of data and communications associated with this investigation, information provided to me by

2

other law-enforcement agents and/or foreign governments, information provided by individuals with knowledge of pertinent facts, cyber experts, including those employed by the FBI, my training and experience, and the training and experience of other law-enforcement agents with whom I have consulted.

5. This Court has jurisdiction to issue the requested warrants from the providers because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## CYBER DEFINITIONS

6. Based on my training officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. "Digital device," as used herein, includes the following three terms and their respective definitions:

i. A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. See 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

3

ii. "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

iii. "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

iv. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security

4

software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

v. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

b. A "server" a computer or operating system that provided resources, data, services, or programs to other computers (commonly referred to as "clients") over a network. There were many types of servers, including web servers that provide content to web browsers, email servers that act as a post office to send and receive email messages, print servers, virtual private servers, and proxy servers.

c. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. There are two types of IP addresses, an IPv4 address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). An IPv6 is written as a group of eight hexadecimal numbers separated by a colon (e.g. 2001:0db8:ac10:fe01:6ab8:1c48:a95a:b1c2). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that

is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e. "Storage medium": A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

f. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

g. "Digital currency" or "virtual currency" is currency that exists only in digital form; it had the characteristics of traditional money, but it did not have a physical equivalent. Bitcoin ("BTC") was an example of cryptocurrency. Cryptocurrency could exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys could be printed or written on a piece of paper or other tangible object. Most cryptocurrencies had a "blockchain," which was a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.

6

h.  "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

i.  "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which third parties do not have access.

j.  "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather

7

sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software. Often it takes the form of "ransomware," meaning software employed onto a system, designed to block the owner's use of the system until a ransom amount, typically in the form of cryptocurrency, is paid to the wrongdoer.

k.      "Social engineering" describes deceptive techniques designed to convince another person to reveal specific information or perform a specific action when the perpetrator would not otherwise have access to that information or action. Phishing was a type of social engineering technique.

**BACKGROUND ON SERVICE PROVIDERS**

7.      The following contains background information on the service providers relevant here: Apple, Inc., Snap Inc., Meta, and Google LLC (the "Service Providers"):

***Apple, Inc.***

8.      Apple is a United States company that produces the iPhone and iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

8

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.      iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

9

e.     Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

9.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email

10

address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

10. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

11. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-

11

provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

12.     Apple also maintains information about the devices associated with an Apple ID (or a "DSID")—a unique numeric identifier for an Apple account. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

13.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo

Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

14. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

13

15.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

16.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of

14

the crimes under investigation including information that can be used to identify the account's user or users.

### Snap, Inc.

17. Based on my training and experience, and on information provided by Snapchat, Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos. Snapchat is a messaging application for mobile phones with Apple's iOS operating system and Google's Android operating system. Snapchat offers four primary ways for users to communicate with each other.

a. "Snaps": A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved. The photo/video can then be sent to a friend in Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior. Snapchat states that it deletes each snap from its servers once all recipients have viewed it. If a snap has not been viewed by all recipients, Snapchat states that it retains the snap for thirty days.

b. "Memories": Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. A user can also edit and send Snaps and create

15

Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by us and may remain in Memories until deleted by the user.

       c.      "Stories": A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

       d.      "Chat": A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

18.     Snapchat also obtains a variety of non-content information from its users. For example:

       a.      Usage Information: Snapchat may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of all snaps to and from an account for the last 31 days, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient, and how a user interacts with these messages (such as when a user opens a message).

       b.      Device Information: Snapchat collects information about the devices of its users, including information about the user's hardware and software,

16

such as the hardware model, operating system version, device memory, advertising identifiers, unique application identifiers, apps installed, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength.

c. Device Phonebook: Snapchat may collection information about the phonebook of the user's device.

d. Cameras and Photos: Snapchat may collect images and other information from the user's device's camera and photos.

e. Location Information: Snapchat may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses.

f. Snap Map: Snapchat allows a user to share location information with his/her friends and also obtain location information about the user's friends. Based on such information, Snapchat places the friends' locations on a map viewable to the user.

g. Information Collected by Cookies and Other Technologies: Snapchat may collect information through cookies and other technologies about the user's activity, browser, and device.

h. Log Information: Snapchat collects log information when a user uses Snapchat's website, including device information, access times, pages viewed, IP address, and pages visited.

***Meta Platforms, Inc.***

19. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

20. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

21. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights

18

information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

23. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19

24. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

25. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

26. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages. Facebook also has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

27. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding

20

someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

28. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

29. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

30. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

31. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta

21

typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

32.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.

Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

33. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**Google LLC**

34. Google LLC is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

23

35.     Signing up for a Google Account automatically generates an email address at the domain, gmail.com. That email address will be the log-in username for access to the Google Account.

36.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

37.     Google services include the following:

a.      Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

b.      Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the

option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

     c.     Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phones or device calendars so they are stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

     d.     Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature

25

or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

e. Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computers or mobile phones to automatically back-up files to their Google Drive Accounts. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grants those with access the ability to edit or comment. Google maintains a record of who made changes to documents edited in Google productivity applications and when they were made. Documents shared with a user are saved in his or her Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

f. Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the

26

option to sync their mobile phones or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

g. Google offers a map service called Google Maps that can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time locations with others through Google Maps by using the Location Sharing feature. Users can also find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Accounts while using Google Maps, they can save locations to their accounts, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

38. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Accounts through their browsers can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop-up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. If a user logs into his

27

or her Google Account on the Chrome browser, his or her subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

39. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

40. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

41. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user

28

deletes a communication or file from his or her Google Account, it may continue to be available on Google's servers for a certain period of time.

42. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

43. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and Internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

44. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address

29

and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

45. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

46. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For example, a list of app downloads may reveal which financial institutions the user used, as individuals commonly download their banks' applications for ease of executing transactions and monitoring accounts. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

47. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google

30

services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## PROBABLE CAUSE

48.    In summary, the FBI is investigating the **Subject Offenses** as committed by a criminal cyber group known as "Scattered Spider," also known as "Octo Tempest." PETER STOKES, who has gone by the monikers "Bouquet", "Spencer," and "Jordan" and at relevant times resided in Estonia, is a member of Scattered Spider responsible for multiple computer intrusions in violation of the **Subject Offenses**. Relevant here, STOKES and other Scattered Spider members are suspected of breaching Company F, a luxury-jewelry retailer, exfiltrating data from Company F, and making a ransom demand of approximately $8 million in cryptocurrency, between May 12 and May 15, 2025. More specifically, according to records from providers, STOKES opened an account with a provider of a secure-tunneling, data-transfer tool used to access and exfiltrate data from Company F's computer network. STOKES created this account from a Virtual Private Network (VPN) proxy service IP address ending in .168. A Microsoft device identifier (a Global Device ID, or GDID, described below) associated with STOKES is linked to the .168 address. There is thus probable cause to believe that STOKES conspired to obtain unauthorized access to the Company F network by fraudulent means, in violation of the **Subject Offense**.

31

49. In addition, and as set forth below, there is probable cause to believe that a search of **Subject Server 1**, the **Subject Accounts**, and the **Subject Google Account** will yield evidence, fruits, and/or instrumentalities of the **Subject Offenses**. More specifically:

a. **Subject Server 1** contains a copy of an overseas server used by STOKES to commit the **Subject Offenses**, according to Microsoft and as described further below, and is thus likely to contain evidence, fruits, and instrumentalities of the **Subject Offenses**.

b. The **Subject Accounts** are service-provider accounts believed to have been used by STOKES and, according to Microsoft and other provider records, were accessed while the user was operating from a device with a unique identifier—the GDID—that STOKES is believed to have used in the intrusion of Company F and committing the **Subject Offenses**. A search of the **Subject Accounts** will therefore provide evidence of STOKES' involvement in the **Subject Offenses**, namely photographs, communications, and activity revealing STOKES as the user of the systems and devices associated with the GDID linked to the intrusion of Company F, as well as evidence of his devices, IPs, and other information concerning his location and whereabouts.

c. Finally, a search of the **Subject Google Account** will reveal evidence and instrumentalities of the **Subject Offenses**, as it was used to set up the phone numbers and data-transfer accounts used in the **Subject Offenses**.

32

***Background on PETER STOKES, a/k/a "Bouquet", "Spencer," and "Jordan," and Scattered Spider***

50.     The FBI is investigating a group of criminal cyber actors and their associates who are part of a group which gains access to victim companies' employee accounts through fraudulent pretenses, accesses victim companies' computers and networks without authorization, encrypts victim companies' data and/or exfiltrates that data to remote servers, extorts cryptocurrency from the victim companies in order for them to regain control over their computers and data and/or to prevent the dissemination of their data, and launders the illegally obtained funds. The group has been referred to as "Scattered Spider," "Octo Tempest," "UNC3944," and/or "0ktapus." It has targeted victims throughout the United States, including in the Chicagoland area, as well as Companies A through H (certain of which are discussed further below). The FBI believes Scattered Spider, or Octo Tempest, has been involved with at over 100 network intrusions, resulting in more than approximately $100 million in ransom payments as well as millions of dollars in damages to the victims.

51.     The FBI believes PETER STOKES is a member of Scattered Spider who has engaged in numerous intrusions, including of Company F. According to State Department and other records, STOKES is a 19-year-old male who is a dual citizen of the United States and Estonia. During the incidents described in this affidavit lived in Tallinn, Estonia. The FBI believes that STOKES has gone by the online

33

monikers "Bouquet" and "Jordan," based on witness interviews,[1] and communications involving Scattered Spider members. In addition, criminal referrals made by Microsoft implicate STOKES.[2] For example, in an October 2024 referral, Microsoft stated:

> Microsoft analysts have identified information about persona 'spencer'[3], a likely operator for Octo Tempest, and their associated accounts. Persona 'spencer' handles malware associated with Octo Tempest and has handled files associated with persona [Conspirator A's moniker].... Persona 'spencer' is likely true name Peter Stokes, and probably lives in Tallinn, Estonia. Microsoft analysts have observed online services telemetry associated with persona 'spencer' that indicates likely involvement in dozens of recent Octo Tempest intrusions including those targeting critical infrastructure organizations in the US and UK and has likely been involved with Octo Tempest since 2022.

---

[1] More specifically, Coconspirator A was a Scattered Spider member who, at the time of certain Scattered Spider intrusions, was a juvenile, and who has been criminally charged for in connection with his Scattered Spider activities. According to Coconspirator A, STOKES committed the **Subject Offenses** against multiple victim-companies with Scattered Spider and went by the monikers "Bouquet" and "Jordan." Coconspirator A attempted to cooperate in the government's investigation but was untruthful in certain respects and continued to offend after law enforcement contact.

[2] Cybersecurity researchers at Microsoft, through the course of their job, have access to data, such as computer machine IDs, IP addresses, and malware samples associated with sophisticated cybergroups. The researchers' function is to identify groups of hackers who appear to operate as a team/cohesive unit (i.e., an APT group). The researchers do this by identifying malicious activity (malware attacks, spear-phishing, etc.) conducted against innocent victims, and then identify the computers used to conduct the attacks. The researchers then identify colleagues of the hacker by finding other computers also accessed from the same IP addresses used by the initially identified hacker. This process enables source's organization to identify unique groups of hackers, sometimes referred to as APT groups, and then track those groups to determine new IP addresses the hackers are observed connecting to the Internet from, such as leased server IPs. This also allows the researchers to determine whether these IP addresses are being used to target victims. Microsoft's referrals and reports related to computer intrusions—such as the report about **Subject Server 1**—have been reliable. In fact, multiple, similar referrals from Microsoft in this and related investigations have been corroborated by later legal process issued by the government.

[3] "spencer" is Microsoft's internal pseudonym for STOKES.

*Company F Computer Intrusion*

52.     Between May 12 and May 15, 2025, Company F, a multibillion-dollar, luxury-item retailer, suffered a computer-network intrusion, resulting in the disruption of business operations and the exfiltration of company data. As set forth below, provider records and IP logs show that STOKES created an account at a provider of a secure-tunneling, data-transfer tool and used that account to effectuate unauthorized access of and, in part, data exfiltration from the Company F network during the intrusion.

53.     Regarding the intrusion, according to a Company F representative and a review of Company F network logs:

        a.      The intrusion incident began on May 12, 2025, with several phishing calls[4] to the Company F informational-technology help desk made by one or more threat actors from two Google Voice[5] phone numbers, one ending in 8777 (the "8777 phone number") and one ending in 2742 (the "2742 phone number"). The threat actors pretended to be Company F employee-users and requested a reset of their authentication credentials, including the password and mobile device for multi-factor authentication. Using this phishing technique, the threat actors compromised three Company F user accounts within approximately two to three hours.

---

[4] These calls were not recorded by Company F, according to a Company F representative.

[5] Google Voice is a web-based VoIP (Voice over Internet Protocol) communication service that provides users with a U.S. phone number for voice calls, voicemail, and text messages. Google Voice is a service that is linked to and accessed from a Google account. When no longer required, a Google Voice number can be unlinked from a certain Google account and made available to be linked to other accounts.

b.      Two of these compromised user accounts belonged to Company F IT administrators. These users had high-privilege user accounts associated with their standard user accounts. To access their high-privilege accounts, those users would have to authenticate their standard user accounts and then be assigned a temporary password for their high-privilege account. The threat actors thus obtained access to high-privilege accounts for these two IT administrator accounts by using their compromised standard user accounts.

c.      The threat actors then used the high-privilege accounts to gain persistent access to the Company F platforms that control virtual servers and manage cloud computing. In May 2025, these platforms were housed in a Company F data center in New Jersey (the "Company F data center").

d.      The threat actors conducted their malicious activity from several Company F virtual servers and virtual desktops in this datacenter. This included a virtual server with a name ending in VB0 (the "Company F server").

e.      As part of their malicious activity, the threat actors used a service called ngrok to circumvent Company F network defenses and enable persistent unauthorized access to the Company F data center. According to ngrok, and based on my training and experience, ngrok is a service used by web developers and others to securely connect local servers to the Internet, allowing broader access to information or applications hosted on local servers.[6] These secure connections are sometimes

---

[6] According to ngrok and my training and experience, ngrok is used to create secure tunnels between an Internet-accessible ngrok endpoint (e.g., https://abc123.ngrok.io) and a service on

called "tunnels."

f.      More specifically, Company F server logs show that on May 12, 2025, threat actors downloaded, installed, and executed an ngrok agent—the program that creates a secure tunnel—on the Company F server. According to Company F, the ngrok agent had the authentication token[7] 2x0b1363KPV35LCUuZCkJag0G84_2btDjSM5oY82TQuiLZvaz (the "ngrok authentication token"). The logs further show that the Company F server established multiple tunnel connections with several ngrok servers. As described below, ngrok records for the account with the ngrok authentication token showed that the threat actors used these tunnel connections to transfer about 99.5 megabytes of data to the Company F data center and transfer about 1.27 gigabytes of data from the Company F data center. Based on my training and experience, this pattern of activity likely indicates initial steps by threat actors for establishing persistent unauthorized access to the Company F data center. This typically includes uploading malicious tools and utilities and downloading sensitive data to facilitate reconnaissance, credential theft, privilege escalation, and lateral movement.

---

a server in a local network (e.g., localhost:3000). This is achieved by running an ngrok agent on the local server. It allows external users to access the local service via the ngrok endpoint. Connection events are inbound network connections from users to an ngrok endpoint. Tunnel events are the ngrok agent's registration to receive connections for an endpoint. This includes information about the ngrok agent, and the two points traffic is being transferred between (e.g., https://abc123.ngrok.io and localhost:3000).

[7] An ngrok authentication token is a unique identifier tied to a single ngrok account. It is used by the ngrok agent to verify the agent's identity to the ngrok cloud service and authorize the creation of secure network tunnels.

g. The threat actors then used the Teleport.sh[8] utility and the Amazon S3[9] online storage utility to exfiltrate large amounts of sensitive Company F data, including OneDrive[10] files belonging to Company F employee-users, Microsoft Active Directory[11] data, and Microsoft Operations Management Suite[12] data.

h. Between May 12, 2025, and May 15, 2025, the threat actors were able to maintain persistent access to the Company F network and, primarily using the Teleport.sh utility and the Amazon S3 online storage utility, exfiltrated at least 77 gigabytes of data, despite ongoing attempts by Company F security personnel to block the attack. According to a Company F representative, the threat actors had likely attempted to deploy ransomware on Company F servers but had been thwarted by the security personnel. On May 15, 2025, the threat actors sent a ransom note to several Company F personnel from a Company F email account they had compromised. The ransom note had the subject "IMPORTANT: WE STOLE THE DATA, CONTACT UMMEDIATELY [sic]." In the email, the threat actors claimed they had stolen 100 gigabytes of data "including raw card information and payment

---

[8] Teleport.sh is a utility that can be used to provide secure remote access to servers. By establishing tunnels, it could be used by threat actors to enable persistent unauthorized access to a victim network while circumventing network perimeter defenses.

[9] Amazon Simple Storage Service (S3) is an online data storage service offered by Amazon Web Services (AWS). Amazon S3 users can create Internet-accessible endpoints, called buckets, to store and retrieve their data.

[10] In a Microsoft 365 enterprise environment, OneDrive is a user's personal cloud storage space, intended for private work files and drafts.

[11] Microsoft Active Directory is a directory service used to centrally manage users, computers, and other network resources within an organization's network.

[12] Microsoft Operations Management Suite is a collection of cloud-based services designed to manage and monitor both on-premises and cloud environments.

details," referring to credit card and related payment information, and threatened to publish the data unless Company F contacted them at a specified email address for negotiations.

i. On May 16, 2025, after Company F security personnel were ultimately successful in evicting the threat actors from the Company F network, Company F contacted the threat actors' email address via third-party negotiators. Between May 16, 2025 and June 2, 2025, the negotiators communicated with the threat actors. During these communications, the threat actors provided samples of the data they had exfiltrated and stated they had cracked passwords belonging to Company F users. Eventually, on June 2, 2025, the threat actors sent a message stating "We are wanting to push things forward, after some consideration $8million seems like a good price. Let us know what you think."

j. Company F did not pay the ransom, and no further attempts were made to communicate with the threat actors. According to Company F, however, the losses due to business disruption, investigation, and mitigation were approximately $2 million, and further losses were expected.

### *The Ngrok Account Was Used in the Company F Computer Intrusion*

54. According to Company F event logs, on May 12, 2025, a compromised Company F administrator account was used to install an ngrok agent on the Company F server. According to Company F event logs and ngrok records, between May 12, 2025, and May 13, 2025, the ngrok account was used to facilitate

unauthorized access to the Company F network and exfiltrate data from the Company F data center.

55.     According to ngrok records, on or about May 12, 2025, at 19:21 UTC, an ngrok account with the ngrok authentication token was created and assigned Account ID ac_2x0b16MSTJk4PvjLZMoqt4vOvZM (the "ngrok account"). Also, according to ngrok records, the IP address of the user who created the ngrok account was 68.235.46.168. According to public IP records, the .168 IP address is assigned to a server hosted by Tzulo. According to Tzulo records, that server is in Mount Prospect, Illinois, and that IP address is assigned to a VPN proxy service. According to ngrok records, the ngrok account had five "connection events" and 12 "tunnel events" with the Company F server between May 12 and May 13, 2025—the dates of the intrusion. Accordingly, I believe the ngrok account was used by the threat actors to establish persistent unauthorized access to the Company F network, as described above.

56.     According to Google records, on May 12, 2025, the Google account with the 8777 phone number—which was used in the phishing calls to Company F—was logged into from the .168 address, the same IP address used to create the ngrok account on the same date. Also, according to Google records, subscriber information for the Google account with the 2742 phone number—the second phone number used in the phishing calls to Company F—included the email address mykccncn109@gmail.com (the **Subject Google Account**). According to ngrok records, subscriber information for the ngrok account included the **Subject Google Account**. And according to Teleport records, the **Subject Google Account** is also

40

included in the subscriber information for the Teleport.sh accounts used in the exfiltration of Company F data. Based on this information, I believe the same threat actors used the 2742 phone number, the 8777 phone number, and the **Subject Google Account** to effectuate the Company F intrusion.

57. According to Microsoft records, the ngrok account was set up through Global Device Identifier g:6755467234350028 ("the GDID"). According to a Microsoft representative, a Global Device Identifier in the Windows ecosystem is a persistent, device-level identifier designed to uniquely identify an installation of a Windows operating system on a device, either a physical device (e.g., a mobile phone or laptop) or virtual machine[13], across certain Microsoft services and scenarios. A GDID is a globally unique identifier tied to the installation of Windows on a device. A GDID remains consistent across Windows operating system updates on a device, but a reinstall of Windows, either on the same device or on a different device, will be tied to a new unique GDID.[14]

58. According to Microsoft records, on May 12, 2025, at 19:21 UTC—when, according to ngrok records, the ngrok account was created—the device with the GDID accessed, among other ngrok pages, "https://dashboard.ngrok.com/signup," the ngrok page to set up an ngrok account.

---

[13] A virtual machine (VM) is a software-based emulation of a physical computer that operates in an isolated environment on a host device. It is like a physical computer in that it runs its own operating system and applications independently. It is distinct, however, because it shares the hardware resources of a physical host rather than having its own dedicated physical components.

[14] Thus, one Microsoft user could have multiple GDIDs.

41

59. Microsoft records also indicate: (1) the user of the device assigned the GDID accessed multiple sites from Tzulo servers in May 2025, including the .168 server (the IP address used to create the ngrok account) on May 12, 2025; and (2) the user of the device assigned the GDID, on May 12, 2025 at 22:47 UTC, a little more than three hours after the ngrok account was created, the user visited "[Company F].com" from the .168 proxy server.

### *STOKES Operates The Subject Accounts*

60. In addition to the above, I believe that STOKES operates the **Subject Accounts** based on the following:

a. The public profile of the **Subject Facebook Account** has a picture of STOKES, based on a comparison between it and his passport photo, the user name Peter Stokes, and multiple friends located in Tallinn, Estonia.

b. Account subscriber records for the **Subject Facebook Account**, the **Subject Snapchat Account**, and the **Subject Apple Accounts** included the phone number 3725502632. According to public telephone records, the carrier of the telephone number is Tele 2, Estonia. According to public sources, Tele2 AB is a provider of mobile services, headquartered in Sweden, and operating in Sweden, Estonia, Latvia, and Lithuania.

c. Account subscriber records for **Subject Apple Account 1** included the city Tallinn and country Estonia.

d. Account subscriber records for **Subject Apple Account 2** included the city Tallinn, the country Estonia, and the billing name "peter s".

e. Account subscriber records for the **Subject Snapchat Account** included the account identifier "Peter".

f. IP activity for the **Subject Accounts** is consistent with State Department records about STOKES's residence in Tallinn, Estonia, and his travel to the United States. According to records from Apple, Snapchat, and Meta, account activity logs for the **Subject Apple Accounts**, the **Subject Snapchat Account**, and the **Subject Facebook Account** mostly contained IP addresses geolocated to Tallinn, Estonia.

g. According to State Department travel records, on April 21, 2024, STOKES travelled from Frankfurt, Germany to Dallas, Texas, and on April 27, 2024, returned from Dallas, Texas, to Frankfurt, Germany. On April 22, 2024, the **Subject Facebook Account** was accessed from the IP address 76.187.97.176, geolocated to Dallas, Texas.

h. According to State Department travel records, on November 15, 2024, STOKES travelled from Munich, Germany to New York, New York, and on November 18, 2024, returned from New York, New York, to Munich, Germany. On November 15, 2024, the **Subject Snapchat Account** and **Subject Apple Account 2** were accessed from the IP address 12.11.109.233, geolocated to New York, New York. On November 16, 2024, and November 18, 2024, the **Subject Snapchat Account** and **Subject Apple Account 2** were accessed from the IP address 207.237.190.238, geolocated to New York, New York.

i.  According to State Department travel records, on November 23, 2024, STOKES travelled from Frankfurt, Germany to New York, New York, and on November 29, 2024, returned from New York, New York, to Frankfurt, Germany. On November 23, 2024, the **Subject Snapchat Account** was accessed from the IP address 80.149.170.9, geolocated to Frankfurt, Germany. On November 29, 2024, the **Subject Snapchat Account**, **Subject Apple Account 2**, and the **Subject Facebook Account** were accessed from the IP address 172.254.197.236, geolocated to New York, New York.

j.  According to State Department travel records, on February 28, 2025, STOKES travelled from Frankfurt, Germany to Los Angeles, California, and on March 6, 2025, returned from Los Angeles, California, to Frankfurt, Germany. On March 1, 2025, the **Subject Apple Accounts** were accessed from the IP address 76.171.164.17, geolocated to Los Angeles, California. On March 2, 2025, **Subject Apple Account 1** and the **Subject Facebook Account** were accessed from this IP address. On March 3, 2025, and March 4, 2025, **Subject Apple Account 1** was accessed from this IP address. On March 5, 2024, the **Subject Apple Accounts** and the **Subject Snapchat Account** were accessed from this IP address. On March 6, 2025, **Subject Apple Account 1** was accessed from this IP address.

*STOKES' Involvement in the Company F Intrusion*

61.  As set forth below, there is probable cause that STOKES is the user of the device that set up the ngrok account used to commit the **Subject Offenses**. More specifically, the GDID assigned to the device that set up the ngrok account has

44

common IP address activity with the **Subject Accounts** used by STOKES (discussed above):

a.      On June 4, 2024, at 2:01 PM UTC, the device with the GDID used the IP address 91.129.97.29, geolocated to Tallinn, Estonia, where STOKES lives. On the same date, this IP address was also used to access the **Subject Facebook Account** at 3:21 PM UTC and the **Subject Snapchat Account** at 1:57 PM UTC.

b.      On November 18, 2024, at 7:31 AM UTC, the device with the GDID used the IP address 207.237.190.238, geolocated to New York, New York. On the same date, this IP address was also used to access **Subject Apple Account 1** at 8:34 AM UTC and the **Subject Snapchat Account** at 3:22 PM UTC. The device with the GDID also used this IP address on November 17, 2024 at 9:21 PM UTC. As stated above, according to State Department travel records, STOKES travelled to New York, New York from November 15, 2024, and November 18, 2024.

c.      On November 26, 2024, the device with the GDID visited the URL empirehotelnyc.com. This is the website for a hotel named "Empire Hotel", located in New York, NY. According to State Department travel records, STOKES travelled from Frankfurt, Germany to New York, NY on November 23, 2024, and returned to Frankfurt, Germany on November 29, 2024.

d.      On February 2, 2025, at 2:37 PM UTC, the device with the GDID used the IP address 110.170.208.226, geolocated to Thailand. On the same date, this IP address was also used to access the **Subject Snapchat Account** at 7:21 PM UTC and the **Subject Apple Account 1** at 9:28 AM UTC and **Subject Apple Account 2**

45

at 1:30 PM UTC. The device with the GDID also used this IP address on January 31, 2025, at 12:45 PM UTC.

62.     On January 8, 2025, the device with the GDID used the IP address 213.35.168.50[15], geolocated to Tallinn, Estonia, where STOKES lives, to visit the URL

https://login.growtopiagame.com/player/login/dashboard?valKey=40db4045f2d8c572 efe8c4a060605726. Based on my training and experience, this indicates the user logged into an online account for the game Growtopia[16]. According to records from Ubisoft, this login occurred to a Ubisoft account with the account identifier ACC03E1B-D54F-4EC5-BA63-68276DFF16AD (the "Ubisoft account"). On January 7, 2025, the same IP address (IP Address 213.35.168.50) was used to access **Subject Apple Account 2** at 5:17 AM UTC and the Ubisoft account two minutes later, at 5:19 AM UTC. Also, the same IP address was used to access the **Subject Snapchat Account**, the **Subject Facebook Account**, and the **Subject Apple Accounts** on several dates from May 31, 2024, through July 16, 2025.

63.     Therefore, based on my training and experience, and overlapping use of the same IP addresses by accounts and devices used by STOKES, it is far more likely that the user of the GDID (who, as discussed above, set up the ngrok account used in the Company F intrusion) and the user of the **Subject Accounts** (STOKES) are the

---

[15] According to public IP records, this IP address is assigned to "Telia Eesti AS" a major national Internet service provider providing broadband, mobile services, and internet infrastructure within Estonia.

[16] Growtopia is a massive multiplayer online game available on the iOS, Android, Windows, and MacOS operating systems. It is owned by the gaming software company Ubisoft.

same person rather than different individuals. In addition, as explained above, the **Subject Google Account** was used to set up the ngrok account used in the **Subject Offenses** and the **Subject Google Account** was also used to set up the 2742 phone number's account and the Teleport.sh accounts used in the **Subject Offenses**. Based on my training and experience, this indicates that STOKES also operated the **Subject Google Account** used in the **Subject Offenses**.

### *STOKES's Involvement in Other Intrusions*

64. In addition to the intrusion at Company F, evidence shows that STOKES has been involved in other Scattered Spider-attributed **Subject Offenses**. For example, according to Company H, an online-communication platform, on or about March 29, 2023, a threat actor obtained a business partner's credentials and, using social engineering, contacted the company to request a resetting of the employee account's two-factor authentication. Through the attack, the threat actor gained access to Company H's internal resources and support systems, including support tickets submitted by Company H users and users' personally identifiable information. According to Company H, during the attack, Coconspirator A, who had a Company H account used two IP addresses that were also used by the threat actor, indicating that Coconspirator A was the threat actor.

65. Company H made a criminal referral to the FBI, which included communications between the suspected threat actors. *See* 18 U.S.C. § 2702(b)(7). Based on those communications, Coconspirator A, using a separate Company H

47

username in his first name, and STOKES, under the username "Bouquet,"[17] discussed and plotted the intrusion. For example, on or about March 30, 2023, shortly after the initial intrusion, between about 0:23 and 3:48 UTC, the two discussed the following[18]:

| | |
|---|---|
| STOKES | im in bed lmk if u need anything |
| Coconspirator A | ok |
| Coconspirator A | yo |
| Coconspirator A | accept vcm |
| Coconspirator A | vm [virtual machine] |
| Coconspirator A | request |
| STOKES | yo |
| STOKES | accepted |
| STOKES | need anything? |
| Coconspirator A | n |
| STOKES | kk |
| Coconspirator A | yo |
| Coconspirator A | can i anydesk [a remote desktop application] |
| Coconspirator A | you |
| Coconspirator A | send code |
| Coconspirator A | i wanna search a [support] ticket |
| STOKES | yo |
| STOKES | send name |
| STOKES | ill search |
| …. | |
| Coconspirator A | lmk when ur out of shower |
| Coconspirator A | ill anydesk it |
| STOKES | when out |

---

[17] According to Company H's referral, the Bouquet account included two images, which, according to Company H, were purportedly of STOKES, which I have compared to STOKES's State Department passport photograph; they do not appear to be the same individual. In addition, however, the "Bouquet" account posted an image in or about January 2023, apparently of homework, with the name "Peter William Stokes" written in the top, right-hand corner. According to a referral provided by Microsoft on October 29, 2024, Microsoft analysts assessed the email address jordanspencer@riseup.net was used by STOKES. Also, as noted above, Coconspirator A confirmed to the FBI that STOKES used the moniker Bouquet.

[18] All bracketed content is based on my understanding of the messages, according to popular acronyms and my training and experience.

| | |
|---|---|
| STOKES | Why |
| Coconspirator A | cause I wanna look thru |
| STOKES | erm ok |
| ... | |
| Coconspirator A | How |
| Coconspirator A | do i search |
| Coconspirator A | Again |
| STOKES | Just |
| STOKES | put whatever |
| STOKES | ui want |
| STOKES | in that |
| STOKES | Search |
| STOKES | Thing |
| … | |
| STOKES | we can term |
| STOKES | any acount |
| STOKES | u got opps? [opposition] |
| ... | LOL |
| Coconspirator A | BRO |
| STOKES | like not term |
| STOKES | disable |
| STOKES | haha |
| Coconspirator A | BRO |
| Coconspirator A | HOW |
| Coconspirator A | SHOW ME |
| … | |
| STOKES | the db [database] is full of google urls |
| STOKES | lmfao |
| STOKES | look |
| Coconspirator A | oh |
| Coconspirator A | wtf |
| Coconspirator A | like |
| Coconspirator A | fake rpeorts |
| … | |
| Coconspirator A | let me try to disable |
| STOKES | wait |
| Coconspirator A | i got a user |
| Coconspirator A | and discrim |
| STOKES | idk |
| STOKES | send |
| STOKES | think uy need |
| Coconspirator A | ill put |
| STOKES | Email |

49

| | |
|---|---|
| Coconspirator A | in search |
| STOKES | Ok |
| STOKES | How |
| STOKES | did u get |
| STOKES | Advancedsearcghh |
| STOKES | Lmfao |
| Coconspirator A | advanced search |
| STOKES | U CAN SEARCH BY CREDIT CARD NUMBER |
| STOKES | LOL |
| Coconspirator A | Nah |
| Coconspirator A | Via |
| STOKES | Oh |
| STOKES | i thoguht it was VISA |
| STOKES | LMFAO |
| STOKES | Are |
| STOKES | u trying |
| STOKES | to term chris> |
| STOKES | ? |
| Coconspirator A | No |
| Coconspirator A | Haha |
| STOKES | Oh |
| STOKES | Haha |
| Coconspirator A | Should |
| Coconspirator A | i click |
| Coconspirator A | Disable |
| Coconspirator A | LOL |
| … | |
| STOKES | u have 30 mins before i kcik u off btw |
| Coconspirator A | Ok |
| STOKES | i gtg to school |
| Coconspirator A | Ok |
| STOKES | and let this shit dump |
| STOKES | Disable |
| STOKES | LM FAOL |
| Coconspirator A | Nah |
| STOKES | r u making |
| STOKES | disable API [application program interface]? |
| STOKES | LOL |
| … | |
| STOKES | idk if u can like disable any account |
| STOKES | they have to have ticket |
| STOKES | i think |
| … | go offline |

| | |
|---|---|
| STOKES | |
| STOKES | stop disabling |
| STOKES | Btw |
| STOKES | we dont want |
| STOKES | to lose access |
| STOKES | Etc |
| Coconspirator A | Nvm |
| Coconspirator A | dont work |
| STOKES | Arghhh |
| STOKES | we should stop disableing |
| STOKES | ppl |
| Coconspirator A | we should |
| Coconspirator A | not be talking on [abbreviation for Company H] |
| STOKES | tg [Telegram] |

66. Based on my training and experience and my role in this investigation, in this discussion, I believe STOKES and Coconspirator A were discussing Company H's network while they had unauthorized access to it. Specifically, the two discussed, among other things, STOKES gaining access to the network through a virtual machine, how to search for support tickets, disable user accounts, and the fact that they should not be having these discussions on Company H's platform.

*Subject Server 1*

67. On or about November 5, 2025, FBI Chicago received a Western Digital hard drive containing downloads from an overseas server used by Scattered Spider to commit the **Subject Offenses**. According to a May 2025 referral from Microsoft, an overseas server ending in .191 (**Subject Server 1**) was "identified," among others, as "associated with Octo Tempest [Scattered Spider] Operational Infrastructure" between at least July 2024 and January 2025. Data files from **Subject Server 1** were

51

saved to the Western Digital hard drive with serial number B00LW5YD, located in the \[root]\191 directory.[19]

68. In the referral, Microsoft indicated that online activity for **Subject Server 1** included, in part, the following:

a. On September 21, 2024 **Subject Server 1** accessed https://mega.io/webclient/loggedout.html; https://mega.nz/fm/eVkDxRxC; https://mega.io/webclient/loggedout.html; and https://mega.io/webclient/loggedin.html. On September 22, 2024, **Subject Server 1** accessed https://file.io/0Oce5LQmGSFy. On September 26, 2024, **Subject Server 1** accessed https://mega.nz/login/lang_en, https://mega.nz/register, https://mega.io/webclient/loggedout.html, and https://mega.io/webclient/loggedout.html. Based on my training and experience and information from MEGA, MEGA.io and MEGA.nz are official domain names for MEGA, a secure cloud storage and communications service known for its focus on privacy and end-to-end encryption. File.io is an online file-sharing service designed for temporary, anonymous, and secure data transfer. It operates similarly to "Snapchat for files," where a shared link is automatically deleted after it has been downloaded once. Based on my training and experience, privacy-centric cloud storage platforms like Mega and File.io are frequently used by cyber criminals to store stolen victim data.

---

[19] Copies of a second server, assigned a different IP address, are saved in a separate directory on the Western Digital hard drive. This application and affidavit do not seek authority to search that second server.

b. On September 25, 2024, **Subject Server 1** accessed https://teleport.sh/ and https://goteleport.com/signup/. Based on my training and experience and open-source records, the websites goteleport.com and teleport.sh belong to Teleport, one of the tools used to exfiltrate data from Company F, discussed above.

c. On October 1, 2024, **Subject Server 1** accessed https://rustdesk.com/. Based on my training and experience and open-source information, RustDesk is a remote desktop and file transfer tool designed as a secure, self-hosted alternative to tools like TeamViewer or AnyDesk. Based on my training and experience, cybercriminals frequently use RustDesk as a Remote Access Trojan (RAT), a type of malware that provides an attacker with unauthorized, covert remote control over an infected computer or mobile device.

d. On January 9, 2025, **Subject Server 1** accessed https://featherwallet.org/download/ and https://downloads.getmonero.org/gui/monero-gui-install-win-x64-v0.18.3.4.exe. Based on my training and experience and open-source information, Featherwallet.org is the official website for Feather Wallet, a free, open-source desktop wallet designed specifically for the Monero (XMR) cryptocurrency. Monero (XMR) is a privacy-focused, open-source cryptocurrency launched in 2014 that is designed to make all transactions confidential and untraceable by default. This differs significantly from Bitcoin, which uses a transparent public ledger where transaction details are visible to anyone. Based on my training and experience,

cybercriminals prefer Monero because its strong, built-in privacy features allow for greater anonymity and freedom from the tracking tools used by law enforcement and blockchain analysis firms for transparent blockchains like Bitcoin. The URL downloads.getmonero.org/gui contains links to download Monero wallet software.

69. Based on my training and experience, as well as my role in this investigation, it is very common for sophisticated cybercriminals, like STOKES and Scattered Spider members, to use dedicated servers to conduct the **Subject Offenses**, including, among other means, to engage in discussions with coconspirators over messaging or social-media applications, to store ransomed cryptocurrency, to conduct research into victim companies and employees, to launch ransomware attacks, and to exfiltrate data from victim companies. Because Microsoft identified the server as one used by STOKES and Scattered Spider to commit the **Subject Offenses**, and because Microsoft's reports, based on its own investigation and data analyses, are exceedingly reliable, I submit that a search of **Subject Server 1** will provide evidence, fruits, and instrumentalities of the **Subject Offenses**, including victim data, coconspirator communications, and records related to attribution of the wrongdoers.

## SEARCH PROCEDURE AND TRAINING AND EXPERIENCE

70. In order to facilitate seizure by law enforcement of the records and information described in Attachments A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of the Service Providers to assist agents in the

54

execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.     The search warrant will be presented to Service Provider personnel who will be directed to the information described in Attachments A and B;

b.     In order to minimize any disruption of computer service to innocent third parties, the Service Providers and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Attachments A, including an exact duplicate of all information stored in the computer accounts and files described therein;

71.     The Service Providers will provide the exact duplicate in electronic form of the information described in Section I of Attachments B and all information stored in those accounts and files to the agent who serves this search warrant. Following the protocol set out in the Addendum to Attachments B, law enforcement personnel will thereafter review all information and records received from the Service Providers to locate the information to be seized by law enforcement personnel pursuant to Section II of Attachments B.

**CONCLUSION**

72.     For these reasons, I submit that there is probable cause to believe that PETER STOKES has violated the **Subject Offenses**. I further submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the **Subject Offenses** will be found in a search of **Subject Server 1**, as described further in Attachments A-1 and B-1; that there is probable cause to believe that evidence of the

55

**Subject Offenses** will be found in a search of the **Subject Accounts**, as described further in Attachments A-2 through A-4 and B-2 through B-4; and that there is probable cause to believe that evidence and instrumentalities of the **Subject Offenses** will be found in a search of the **Subject Google Account**.

FURTHER AFFIANT SAYETH NOT.

ALI SADIQ
Special Agent, FBI

SWORN TO AND AFFIRMED by telephone December 22, 2025.

Honorable Daniel P. McLaughlin
United States Magistrate Judge

56